* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioners Garner and Deluca, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses the Opinion and Award of Deputy Commissioner Deluca and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties prior to the hearing in a Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. At the time of the alleged injury by accident, the parties were subject to and bound by the provisions of the Workers' Compensation Act.
2. At the time of the injury giving rise to this claim, Bethlehem Center, Inc., was insured by Wausau Insurance Companies.
3. The plaintiff sustained a compensable injury by accident on September 18, 2001.
4. All parties have been correctly designated, there is no question as to misjoinder of parties, and the parties are subject to the jurisdiction of the North Carolina Industrial Commission.
5. All applicable Industrial Commission forms including, but not limited to, Forms 18, 19, 22, 33, 33R, and 61 may be received into evidence.
 * * * * * * * * * * *
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. The plaintiff works as a teacher for the defendant-employer, which requires that she take care of small children for the defendant-employer's day care center. Her date of birth is July 2, 1955.
2. The plaintiff suffered a compensable injury by accident arising out of and in the course and scope of her employment with the defendant-employer on September 18, 2001, when she sat down in a chair and the chair broke, causing her pain in her right leg and back.
3. The plaintiff's claim was accepted as compensable on a Form 60, and she received medical and indemnity benefits accordingly.
4. The plaintiff's average weekly wage at the time of her injury was $390.78, which yields a compensation rate of $260.53.
5. Following her injury, the plaintiff was taken by ambulance to Presbyterian Hospital where she reported knee pain and pain in her mid to lower back. X-rays taken showed mild narrowing of the medial joint compartment; mild degenerative disc disease in the lumbar spine; mild to moderate facet arthrosis at L4-5, and L5-S1 bilaterally; and mild degenerative changes of the thoracic spine. The plaintiff was examined, treated, and released with prescription medication, and the recommendation that she use crutches, an ice pack, and heat. She was advised to follow up with an orthopedist.
6. The plaintiff first treated with Dr. James Foster on September 19, 2001. On that date, he assessed the plaintiff with a sprain to her right knee and her lumbosacral spine. He noted an objective finding of a small effusion on the plaintiff's knee as well as a decreased range of motion and a report of tenderness. With regard to the spine, he noted "no signs of acute trauma." There were no fractures, dislocations, broken bones, or dislocated joints and the x-ray findings were negative. In addition, there was no bruising noted to the back or knee.
7. On September 26, 2001, Dr. Foster noted some swelling in the plaintiff's knee, but he could not say there was any fluid present. On that date, he doubted any permanent disability and did not note any objective findings as to the spine at that time.
8. Dr. Foster next saw the plaintiff on October 10, 2001. At that time, there were no objective findings or abnormalities of the knee and no objective findings as to the spine.
9. On October 25, 2001, an MRI of the plaintiff's knee and spine, ordered by Dr. Foster, revealed no apparent acute injury.
10. On October 25, 2001, the plaintiff went to her family doctor, Michael Metcalf, M.D., reporting that she had hurt her right knee and back in a fall at work. Dr. Metcalf diagnosed a right knee and lumbosacral strain and advised that the plaintiff follow up with the orthopedist and the physical therapy he was recommending.
11. On October 25, 2001, the plaintiff was re-examined by Dr. Foster who noted that the plaintiff was reporting improvement with respect to her knee, but that it still hurt with movement, ached, and would swell. The plaintiff also reported continued trouble with her back, specifically that it would interfere with her sleep, and caused her significant pain. Dr. Foster's diagnosis at that time was unchanged and he advised that the plaintiff remain out of work until November 6, 2001, at which time she was to be re-examined.
12. The plaintiff returned to Dr. Foster on November 6, 2001, reporting decreasing symptoms with respect to her knee, but that her back continued to catch and lock up. After examining the plaintiff, Dr. Foster indicated that she could return to light-duty work on November 12, 2001, working four hours per day, five days per week, with the restrictions that she not lift more than ten pounds, and that she avoid prolonged stooping, squatting and no standing or walking more than twenty minutes out of every hour.
13. On November 19, 2001, the plaintiff went back to Dr. Michael Metcalf, who noted that she was tender in the lumbosacral area and the right knee.
14. Dr. Foster saw the plaintiff on November 20, 2001, noting that she had returned to work and had experienced significant pain and discomfort. The doctor recommended that the plaintiff continue to work light duty, four hours per day, with no lifting more than five to ten pounds, and recommended a return visit in three weeks.
15. The plaintiff saw Dr. Foster again on December 11, 2001, and January 9, 2002 for her back and knee and reported essentially the same symptoms as in previous visits. Dr. Foster recommended continued work restrictions during this period and gave her an injection to her back on January 9, 2002.
16. On January 14, 2001, the plaintiff was seen by Dr. Metcalf again who examined her, noting the ongoing symptoms with the plaintiff's back and knee. Dr. Metcalf indicated in his records that he felt the plaintiff was probably suffering from myofascial syndrome and/or fibromyalgia and referred her for a rheumatology consultation.
17. Dr. Glen McCain, a rheumatologist, examined the plaintiff on February 6, 2002. Consistent with Dr. Metcalf's opinion, Dr. McCain diagnosed the plaintiff with fibromyalgia syndrome, noting leg, back, shoulder and chest pain as well as fatigue, depression, listlessness, disturbed sleep pattern, weight loss and poor appetite. Dr. McCain's medical records contains a notation that the plaintiff's "job is an aggravating factor and is helping perpetuate her chronic pain."
18. In his deposition, Dr. McCain testified that, though there are many causes of fibromyalgia, 40 percent of such cases are caused by a trauma such as the fall experienced by the plaintiff. Furthermore, based upon his experience, Dr. McCain was of the opinion that the job duties of teachers, like the plaintiff, worsen the symptoms of fibromyalgia because of the high degree of stress and physical demands (e.g. "standing on her feet all day") that are placed on teachers. Dr. McCain further stated that, based upon his experience, plaintiff's teaching occupation was the "number one profession where they develop fibromyalgia."
19. The defendants contend that Dr. McCain's opinion regarding the causal relationship between plaintiff's injury and her fibromyalgia does not rise above the level of speculation and conjecture; however, the Full Commission finds that Dr. McCain's testimony regarding the likelihood of developing the condition after a trauma, coupled with the common occurrence of the condition amongst teachers, establishes the requisite degree of medical certainty in which to find a causal relationship between plaintiff's injury and condition. Thus, the Full Commission finds that the greater weight of the competent evidence of record establishes the existence of a causal connection between the plaintiff's compensable injury of September 18, 2001, and the fibromyalgia with which she was diagnosed on February 6, 2002.
20. On February 7, 2002, the plaintiff returned to Dr. Foster for examination. She reported that her knee felt weak and would give out at times, and that her back pain was preventing her from sleeping and was aggravated by bending, lifting, pushing, or pulling. The plaintiff further reported that her back had made improvement during the period of time she was in therapy. Dr. Foster felt it appropriate to consider whether the plaintiff was suffering from chronic pain syndrome. Dr. Foster's diagnosis upon examining the plaintiff on February 7, 2002, was chronic thoracic and lumbar sprain and knee sprain. Dr. Foster recommended that the plaintiff be evaluated in the Spine Center and wrote her out of work again.
21. On February 14, 2002, the plaintiff was examined by Alfred Rhyne, M.D., of Charlotte Orthopedic Specialists who noted that she reported continual back and leg pain. Dr. Rhyne found that the plaintiff had a strain to the thoracic and lumbar spine, and tenderness of the right medial collateral ligament of the knee. Dr. Rhyne recommended that the plaintiff remain out of work until her next appointment with Dr. Foster, and referred the plaintiff to T. Kern Carlton, M.D., of the Rehabilitation Center.
22. On February 28, 2002, Dr. Foster saw the plaintiff. He concurred with Dr. Rhyne's opinion that the plaintiff be examined by Dr. Carlton, and advised that the plaintiff remain out of work.
23. The plaintiff was examined by T. Kern Carlton of the Rehab Center on March 14, 2002. Dr. Carlton's impression was that the plaintiff was suffering from post thoracolumbar strain and right medial collateral ligament sprain. He encouraged the plaintiff to lose weight, adjusted the dosage of one of her medications, and recommended another course of physical therapy with an emphasis on functional restoration.
24. On March 28, 2002, the plaintiff was examined by Dr. Foster. Her knee had given out again and her back was still hurting. Dr. Foster recommended that the plaintiff remain out of work and start rehabilitation therapy for her injuries.
25. The plaintiff was re-examined by Dr. Carlton on April 12, 2002. She reported that she had decreased her medication, had walked more, had lost fifteen pounds, and had started physical therapy. The plaintiff's right knee was still giving way, and she had tenderness over the medial aspect of the knee, which necessitated a knee brace. The plaintiff also had tenderness and stiffness in the low back. Dr. Carlton's diagnosis was unchanged and he felt that the plaintiff was making progress. He recommended that the plaintiff continue to lose weight and do physical therapy.
26. The plaintiff saw Dr. Foster on April 25, 2002, and he advised her to continue with therapy until May 6, 2002. At that point, she was able to return to work part-time with lifting restrictions. The plaintiff returned to work on or about May 6, 2002.
27. On May 13, 2002, the plaintiff went to Dr. Carlton, reporting that she had aggravated her knee and back pain while chasing a child at work the prior week. The doctor examined her, and advised that the plaintiff be seen by an orthopedist for evaluation of a possible meniscal tear in her right knee.
28. On June 6, 2002, Dr. Foster re-examined the plaintiff and referred her to a knee surgeon for her ongoing knee pain. He advised that she continue her part-time, light-duty work, stop her therapy, and start using a TENS unit at home.
29. The plaintiff was examined by Yates Dunaway, M.D., of Charlotte Orthopedic Specialists on July 5, 2002. Dr. Dunaway felt that the plaintiff did not have significant intra-articular pathology and was not a surgical candidate at that time.
30. On July 8, 2002, Dr. Foster assigned a fifteen percent (15%) impairment rating to the plaintiff's back, and a fifteen percent (15%) impairment rating to her right leg.
31. In his deposition, Dr. Foster testified that the fifteen percent (15%) rating assigned to the plaintiff's back and right leg were each "in direct reference to the injury of 2001." When asked at deposition about the objective findings that would support the rating to the plaintiff's right leg, Dr. Foster answered:
 She had a one-plus effusion, a small effusion, which is an objective finding. There was fluid on the joint. And she had decreased range of motion of that knee, which was I felt an objective finding. She had tenderness along the mediocollateral ligament in the femoral origin but no instability. And this is a case where the complaint of tenderness was very consistent with the physical findings.
Dr. Foster also testified that the spasms of the plaintiff's lumbar spine, which caused continued pain, provided objective findings in which to support the fifteen percent (15%) rating assigned to the plaintiff's back.
32. The defendants contend that Dr. Foster's opinion regarding the causal relationship between the plaintiff's injury and the fifteen percent (15%) rating to her back and right leg does not rise above the level of speculation and conjecture; however, the Full Commission finds that Dr. Foster's testimony regarding the objective findings upon which he based such ratings establishes the requisite degree of medical certainty in which to find a causal relationship between the plaintiff's injury and disability ratings. Thus, the Full Commission finds that the greater weight of the competent evidence of record establishes the existence of a causal connection between the plaintiff's compensable injury of September 18, 2001, and the fifteen percent (15%) ratings assigned to her back and right leg by Dr. Foster on July 8, 2002.
33. On August 5, 2002, the plaintiff returned to Dr. Foster, who noted ongoing complaints of instability in the plaintiff's knee, and that her back continued to hurt. The doctor imposed permanent restrictions: plaintiff was not to lift more than fifteen pounds, was not to lift more than five pounds over her shoulders, and was not to stand or walk more than ten minutes out of every hour. Dr. Foster administered another trigger-point injection into the plaintiff's thoracic spine and released the plaintiff from his care. The plaintiff returned to work for the defendant-employer pursuant to Dr. Foster's recommendations.
34. On September 29, 2003, the plaintiff saw Dr. Metcalf, due to severe mid back pain and spasms, with associated nausea and vomiting. Dr. Metcalf found the plaintiff's symptoms to be the same or similar to those she had experienced in the past, and felt that it was a flare up of low back pain from her workers' compensation injury. He gave the plaintiff an injection for her symptoms and allowed her to return to work the following day.
35. On November 11, 2003, the plaintiff returned to Dr. Metcalf, reporting severe low back pain with associated tingling in her leg, nausea, and vomiting. Dr. Metcalf referred the plaintiff back to Dr. Foster, indicating that the plaintiff had experienced a flare up of pain, and that her symptoms were a result of her workers' compensation injury. Dr. Metcalf requested Dr. Foster re-evaluate and treat the plaintiff for her workers' compensation injury.
36. On November 11, 2003, the plaintiff went to Charlotte Orthopedic Specialists and saw Yates Dunaway, M.D., who noted the onset of more severe pain in the plaintiff's spine and right knee. He referred the plaintiff to Patricia Shannon, M.D., a physiatrist with Charlotte Orthopedic Specialists.
37. On December 3, 2003, the plaintiff was seen by Dr. Shannon, who noted that the plaintiff reported pain from the interscapular area down the low back and buttocks into both legs; that her symptoms were worsened by lying down, sitting, walking, bending, twisting, coughing, and sneezing; but that her symptoms were relieved with rest, medication, and using a TENS unit. Dr. Shannon's impression was that the plaintiff was suffering from chronic thoracic and low back pain, underlying spondylosis with facet arthrosis in the lumbar spine, and underlying degenerative disc disease in the lumbar spine. Dr. Shannon recommended that the plaintiff resume her home exercise program and prescribed additional medications.
38. On January 22, 2004, the plaintiff saw Dr. Foster by order of the Industrial Commission for the purpose of assessing her condition as of that date. Dr. Foster noted marked tenderness and spasm in the thoracic spine and in the trapezius area, and administered an injection. Dr. Foster found that the plaintiff had not improved since he had seen her in August of 2002 and recommended that she continue with her previous work restrictions. Of important note, Dr. Foster found that the plaintiff had the same fifteen percent (15%) impairment ratings to the back and right leg as assigned on July 8, 2002. Dr. Foster had nothing further to offer from an orthopedic surgeon's perspective, and recommended that the plaintiff participate in a chronic pain management program and receive psychological testing.
39. The plaintiff has experienced a flare up of her symptoms from her compensable injuries to her spine and knee. Since being released by Dr. Foster on August 5, 2002, the plaintiff has received appropriate treatment for her injuries from Dr. Metcalf on September 29, 2003, November 11, and November 17, 2003; from Dr. Dunaway on November 11, 2003; from Dr. Shannon on December 3, 2003; and from Dr. Foster on January 22, 2004. As of the date of the hearing before the Deputy Commissioner, the plaintiff had continued to work for the defendant-employer.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The greater weight of the competent evidence of record establishes the existence of a causal connection between the plaintiff's compensable injury of September 18, 2001, and the fibromyalgia with which she was diagnosed by Dr. McCain on February 6, 2002. N.C. Gen. Stat. § 97-2(6).
2. The greater weight of the competent evidence of record establishes the existence of a causal connection between the plaintiff's compensable injury of September 18, 2001, and the fifteen percent (15%) rating assigned to her back by Dr. Foster on July 8, 2002. N.C. Gen. Stat. §97-31(23).
3. The greater weight of the competent evidence of record establishes the existence of a causal connection between the plaintiff's compensable injury of September 18, 2001, and the fifteen percent (15%) rating assigned to her right leg by Dr. Foster on July 8, 2002. N.C. Gen. Stat. § 97-31(15).
4. The plaintiff is entitled to the payment of medical expenses incurred or to be incurred as a result of her compensable injury, including the treatment for her fibromyalgia, as may reasonably be required to effect a cure, provide relief, or lessen her period of disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
 * * * * * * * * * * *
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. The defendants shall pay to the plaintiff permanent partial disability benefits for the fifteen percent (15%) rating assigned to her back by Dr. Foster on July 8, 2002, subject to the attorney's fee provided herein. This compensation has accrued and shall be paid to the plaintiff in a lump sum.
2. The defendants shall pay to the plaintiff permanent partial disability benefits for the fifteen percent (15%) rating assigned to her right leg by Dr. Foster on July 8, 2002, subject to the attorney's fee provided herein. This compensation has accrued and shall be paid to the plaintiff in a lump sum.
3. The defendants shall provide for the payment of medical expenses incurred or to be incurred as a result of the plaintiff's compensable injury, including the treatment for her fibromyalgia, as may reasonably be required to effect a cure, provide relief, or lessen her period of disability.
4. The defendants shall pay to the plaintiff's counsel a reasonable attorney's fee in the amount of twenty-five percent (25%) of the compensation awarded to the plaintiff herein. Because this fee is based upon compensation that has accrued, the plaintiff's counsel shall be paid in a lump sum.
5. The defendants shall pay the costs, which includes a witness fee of $600.00 to Dr. Foster and $400.00 to Dr. McCain, if not paid by prior order.
This 16th day of January 2005.
 S/ ________________________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/ ________________________ BERNADINE S. BALLANCE COMMISSIONER
 S/ ________________________ PAMELA T. YOUNG COMMISSIONER